**ROBOSERVE, LTD., Plaintiff–Appellee, Cross–Appellant,**

v.

**TOM'S FOODS, INC., a Delaware Corporation, Defendant–Appellant, Cross–Appellee.**

No. 89–8945.

United States Court of Appeals, Eleventh Circuit.

Sept. 4, 1991.

Frank C. Jones, L. Joseph Loveland, Theodore B. Eichelberger, King & Spalding, Atlanta, Ga., James E. Humes, II, Hatcher, Stubbs, Land, Hollis & Rothschild, Columbus, Ga., for defendant-appellant, cross-appellee.

Robert B. Breisblatt, Jerold B. Schnayer, Welsh & Katz, Chicago, Ill., W.G. Scrantom, Jr., Mark R. Youmans, Page, Scrantom, Harris & Chapman, Columbus, Ga., for plaintiff-appellee, cross-appellant.

## ON PETITION FOR REHEARING AND SUGGESTION OF REHEARING EN BANC

(931 F.2d 789 (11th Cir.1991))

Before CLARK and BIRCH, Circuit Judges, and COFFIN[*], Senior Circuit Judge.

BIRCH, Circuit Judge:

No member of this panel nor other judge in regular active service on this court has requested that the court be polled on re-

hearing en banc, pursuant to Fed.R.App.P. 35 and 11th Cir. Rule 35–5. Accordingly, the suggestion of rehearing en banc is DENIED. However, the original panel hereby grants rehearing, withdraws the previous panel opinion dated May 17, 1991 and published at 931 F.2d 789, and substitutes the following opinion:

This dispute between Roboserve, Ltd. ("Roboserve") and Tom's Foods Inc. ("Tom's") involves a complex commercial relationship that began in 1981 and ended in 1987. The case was tried twice in the United States District Court for the Middle District of Georgia. After the first trial, the jury found for the plaintiff Roboserve on all counts and awarded damages of $9,500,000. The district judge granted Tom's motion for new trial because he concluded that the verdict was speculative and excessive. A second jury found for Roboserve on three of five counts and awarded $4,745,000. On appeal, Roboserve argues that the district court erroneously granted Tom's motion for new trial after the first trial as well as Tom's motion for directed verdict on the issue of punitive damages after the second trial. Tom's appeals the district court's denial, after the second trial, of its motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, for a new trial on each count that the second jury decided in favor of Roboserve. For the reasons that follow, we AFFIRM in part, REVERSE in part, and REMAND for the limited purpose of separating Roboserve's recoverable damages from those improperly awarded by the second jury on Count IV of the complaint.

## I. BACKGROUND

Roboserve is a United Kingdom corporation that manufactures commercial vending machines. Tom's is based in Columbus, Georgia, and is a producer and seller of snack foods. Many of Tom's products are sold through a network of vending machines operated by its distributors, and

---

[*] Honorable Frank M. Coffin, Senior U.S. Circuit Judge for the First Circuit, sitting by designation.

Tom's sells those machines to distributors after purchasing them from the manufacturer.

In the late 1970's, Tom's considered adding a hot beverage program to its existing line of snack foods. Tom's specific goals for this program ultimately required an "in-cup" hot beverage machine that vended a foam cup. An "in-cup" system uses stacks of cups that are loaded into the machine with the dry ingredients (coffee, soup, hot chocolate) pre-packaged in the bottom of each cup. After the customer makes a selection, the machine releases the appropriate cup and adds hot water. Tom's wanted its system to use foam cups, instead of paper or plastic, for superior insulation; a foam cup keeps the drink hot while remaining cool to the touch. Foam cups present unique mechanical problems for an in-cup system, however, because they are easily damaged. Moreover, static electricity may cause the dry ingredients in one cup to cling to the outside of the next cup in the stack.

Tom's first met with Roboserve in 1981 because Roboserve claimed to have designed a machine that would meet Tom's requirements for its hot beverage program. Roboserve also manufactured and filled a static-free foam cup for its machine. Talks between the parties ended when they could not agree to terms for a 25–unit test of the Roboserve "Stax" machine. Two years later, the parties resumed negotiations after Tom's failed to obtain a satisfactory machine from another manufacturer. Tom's ultimately agreed to purchase 25 Stax machines from Roboserve for a market test. The purchase order was placed in January, 1984.

Tom's signed a Roboserve confidentiality agreement on May 16, 1984. The parties dispute the purpose and effect of that agreement, which was signed before Roboserve delivered the first 25 Stax machines. In the district court, Tom's contended that the agreement protected only confidential cup costing information that Roboserve produced to Tom's in May, 1984. Roboserve countered that operation and maintenance information on the Stax machines, as well as the machines themselves, were recognized as confidential and subject to the agreement.

After May of 1984, the story of this relationship is remarkably dependent upon who tells the tale, but a few facts are undisputed. The parties met and negotiated in June, September and November, 1984, and periodically thereafter. Tom's purchased 260 Stax machines from Roboserve with a purchase order dated January 3, 1985, and an additional 1000 machines with a purchase order dated February 12, 1986. After the order for 1000 machines, Tom's never purchased another Stax machine from Roboserve.

In November, 1986, Tom's sent one of its Stax machines to Polyvend, a manufacturer of vending machines based in Conway, Arkansas. Polyvend built snack machines for Tom's and had previously failed in an attempt to provide Tom's with an acceptable in-cup hot beverage system. When Tom's told Roboserve what it had done, Roboserve objected vehemently, and Tom's subsequently retrieved the machine from Polyvend. The parties met for the last time in January, 1987, and were unable to resolve their differences. In February, Tom's informed its distributors that it was no longer doing business with Roboserve. About that time, Tom's also sent another Stax machine to Polyvend so that Polyvend could "retrofit" the machine to accept non-Roboserve cups.

On May 20, 1987, Roboserve filed its complaint in this action. Four of nine counts in the complaint were dismissed before the first trial.[1] The remaining claims included breach of contract (Count VI), breach of confidential relationship (Count II), breach of confidentiality agreement (Count III), misappropriation of trade secrets (Count IV), and promissory estoppel (Count VII).[2]

---

1. The dismissed claims alleged violation of the Sherman Act (Count I), unfair competition (Count V), and copyright infringement (Counts VIII and IX).

2. After the first trial, the district court refused to rule on Roboserve's promissory estoppel claim until the second trial. R3–142–1. Our

The crux of Roboserve's complaint was that the parties had agreed to terms on an oral contract during meetings in June, September and November, 1984. The alleged contract would have obligated Tom's to purchase a total of 15,260 Stax machines over six years. Minimum purchase quantities were specified for each year through 1990; according to Roboserve, Tom's 260-unit and 1000-unit orders satisfied the minimum requirements for the first two years of the contract. Roboserve also claimed that Tom's was obligated to purchase all of its cup requirements for the Stax machines from Roboserve for the life of the contract, which was 20 years. Although the alleged oral contract was never formally reduced to writing, Roboserve offered several documents, including correspondence between the parties and Tom's internal memoranda, to support its contract claim.

Tom's denied, and continues to deny, that the parties agreed to an oral contract. According to Tom's, the documents offered by Roboserve to prove the existence of a contract contain "terms" that are properly characterized as projections and assumptions in connection with Tom's prolonged market test of the Stax machines. Tom's answer to Roboserve's complaint included a six-count counterclaim, but five of those counts were dismissed before the first trial. The remaining counterclaim sought $27,-943.48 for an alleged overpayment on the 1000 machine order from February, 1986.

## II. DISCUSSION

### A. *Tom's Motion For New Trial After The First Jury Verdict*

At the end of the first trial, Roboserve's claims for breach of contract (Count VI), breach of confidential relationship (Count II), breach of confidentiality agreement (Count III) and misappropriation of trade secrets (Count IV) went to the jury along with Tom's counterclaim. The jury returned a $9,500,000 verdict for Roboserve on all counts, and Tom's moved for JNOV or, alternatively, for a new trial. The district court ordered a new trial, stating that review of the record has not revealed any pre-

it perceived the verdict to be excessive and "a matter of astonishment to all concerned." R3–135–2. Roboserve appeals that decision.

■ An appeal from an order granting a new trial is properly taken after entry of final judgment in the second trial. *Evers v. Equifax, Inc.,* 650 F.2d 793, 796 (5th Cir. Unit B July 1981). We look to Georgia law to determine whether the verdict is excessive, but federal law applies to our review of the decision to order a new trial as the result of an excessive verdict. *See Quality Foods, Inc. v. U.S. Fire Ins. Co.,* 715 F.2d 539, 542 n. 2 (11th Cir.1983).

In Georgia, "the court should not interfere with the jury's verdict unless the damages awarded ... are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case." O.C.G.A. § 51–12–12(a) (1987). The jury awarded Roboserve $5,000,000 for breach of contract (Count VI) and $1,000,-000 in compensatory damages for each of Counts II, III and IV, plus $500,000 in punitive damages for breach of confidential relationship (Count II) and $1,000,000 in punitive damages for misappropriation of trade secrets (Count IV).

At the time of the alleged breach of contract in 1987, Roboserve had been selling machines to Tom's for only two years and had never sold a Stax machine to anyone else. The damages awarded for breach of contract presumably included profit from Tom's purchase of at least 15,260 machines, which was expressly contemplated by the alleged contract. However, the district court noted that

to produce $5,000,000 in profits Tom's would have had to buy from Roboserve and sell to its distributors about 50,000 machines. This appears to be unrealistic. So the amount of damages awarded by the jury was presumably on account of the future loss of sale of disposable cups to be used in the machines.... While it is true that if there was an oral contract, as determined by the jury, there would have been *some* sales of machines and *some* sales of cups, ... the liminary or final disposition of this claim.

award of $5,000,000 for hypothetical lost profits is grossly excessive.

R3–135–3–4 (emphasis in original).

The district court also determined that the total award of $4,500,000 for Counts II, III and IV was excessive and unsupported by the evidence. Tom's shipped a Stax machine to Polyvend on two occasions, in November, 1986 and February, 1987. Those acts were "the only evidence offered by Roboserve of wrongful conduct by Tom's" in connection with Counts II, III and IV. R3–135–4. Moreover,

> Roboserve presented no evidence that it has been financially harmed in any way as a result of Tom's shipment of the machine to Polyvend.... One of Roboserve's own witnesses testified that the shipment of the machine has not led to any competing designs, or sales attempts by others, nor has it cost Roboserve any lost sales.... These facts suggest an award of nominal damages—not $4,500,-000.

R3–135–5.

■ Once the district court decided that the jury verdict was excessive, it had discretion to grant a new trial. On appeal, we must affirm that decision unless we find an abuse of discretion. *Simon v. Shearson Lehman Bros., Inc.*, 895 F.2d 1304, 1310–11 (11th Cir.1990). The abuse of discretion standard may be more or less strictly applied and varies with the nature of the issue presented for review. *See, e.g., Rixey v. West Paces Ferry Hosp., Inc.*, 916 F.2d 608, 612 (11th Cir.1990); *Deas v. PAC-CAR, Inc.*, 775 F.2d 1498, 1503–04 (11th Cir.1984), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1658, 90 L.Ed.2d 201 (1986).

■ This situation presents a conflict between the jury, as constitutionally appointed fact finder, and the trial judge, whose "unique opportunity to consider the evidence in the living courtroom context must be respected." *Taylor v. Washington Terminal Co.*, 409 F.2d 145, 148 (D.C.Cir.), *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969). A deferential standard of review is appropriate because we are constrained to search a cold record for insight into both the jury's basis for its verdict and the judge's reason for overturning that verdict. *See id.* at 148–49. The factual complexity of this case also justifies greater deference to the district court's decision than might otherwise be afforded. *See Deas*, 775 F.2d at 1503–04.

The district court found the first jury's verdict to be "so grossly excessive as to shock the conscience" when measured against the evidence admitted at trial on the issue of Roboserve's damages. R3–135–5; *see Simon*, 895 F.2d at 1319. After reviewing the record, we hold that the basis for that conclusion was adequately explained in the order granting Tom's motion for new trial with respect to each count of Roboserve's complaint. However, the district court's order did not discuss Tom's counterclaim, and Roboserve maintains that the first jury's decision in its favor on the counterclaim should be reinstated.

■ Pursuant to Fed.R.Civ.P. 59(a), the district court had discretion to order a new trial on "all or part of the issues" in response to an excessive verdict. *See, e.g., Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 499–500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). Tom's counterclaim alleged an overpayment for the 1000 machines it purchased in 1986, while Roboserve argued that the overpayment was used to offset an outstanding debt that Tom's had refused to pay. The counterclaim was severable from the rest of the case because the first jury could decide the counterclaim as an independent issue, without reference to the contract, trade secret and confidentiality issues raised by Roboserve's complaint. *See id.*

Accordingly, we find no abuse of discretion and affirm the grant of a new trial as to each count of Roboserve's complaint. On Tom's counterclaim, however, the district court did abuse its discretion by granting a new trial, and we therefore reinstate the first jury's verdict on the counterclaim in favor of Roboserve. *See Steinberg v. Indemnity Ins. Co. of North America*, 364 F.2d 266, 274 (5th Cir.1966).

B. *Motions And Appeals After The Second Jury Verdict*

At the end of the second trial, the district court granted Tom's motion for directed verdict on Roboserve's request for punitive damages in Counts II and IV of its complaint. The jury was then asked to decide the same five claims that were resolved in the first trial, without the punitive damages issue. The jury awarded Roboserve $3,645,500 for Count VI (breach of contract), found in favor of Tom's on Count III (breach of confidentiality agreement), and found for Roboserve on Count II (breach of confidential relationship) and Count IV (misappropriation of trade secrets). The form of verdict used, however, permitted only one award of damages to Roboserve if it prevailed on any or all of Counts II, III and IV, so the jury awarded $1,100,000 for Counts II and IV. Tom's also received $27,943.48 for prevailing on its counterclaim, but that award is precluded by our decision to reinstate the first jury's verdict on the counterclaim.

Although Tom's fared better before the second jury than the first, it again moved for JNOV or, alternatively, for a new trial on Counts II, IV and VI. Both motions were denied by the district court, and Tom's appeals. Roboserve also appeals the district court's grant of a directed verdict to Tom's on the punitive damage claims in Counts II and IV. We will consider each of these arguments in turn.

1. Tom's Motion For JNOV Or New Trial On The Breach Of Contract Claim (Count VI)

■ We apply different standards to review the district court's decision to deny Tom's alternative motions for JNOV or new trial after the second trial. A motion for new trial is reviewed under the abuse of discretion standard. *Sentry Indemnity Co. v. Peoples*, 856 F.2d 1479, 1481 (11th Cir.1988). However, on a motion for JNOV, we must independently determine whether the facts and inferences point so overwhelmingly in favor of the movant, Tom's, that reasonable people could not arrive at a contrary verdict. *See Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989).

During both trials, Roboserve claimed that the parties had agreed to terms on an oral contract for the purchase of Stax machines and filled cups during negotiations between June and November, 1984. The contract as alleged would have obligated Tom's to purchase at least 15,260 machines through 1990, in yearly increments of 260, 1000, 2000, 4000, 4000 and 4000. Roboserve also claimed that Tom's agreed to purchase filled cups for its Stax machines exclusively from Roboserve for 20 years. Roboserve attempted to prove the existence and terms of the contract through documentary evidence and oral testimony.

a. The Statute Of Frauds

■ Tom's contends that Roboserve's contract claim did not meet the requirements of the Georgia Statute of Frauds, O.C.G.A. § 11–2–201, and should not have been submitted to the jury. Any contract involving a sale of goods for $500 or more must be proved through a "writing sufficient to indicate" that a contract has been made, and

the Georgia Court of Appeals has interpreted this statute to set forth "three definite and invariable requirements" for a writing to be sufficient: (1) it must evidence a contract for the sale of goods, (2) it must be "signed" by the party against whom enforcement is sought, and (3) it must specify a quantity. *Jinright v. Russell*, 123 Ga.App. 706, 182 S.E.2d 328 (1971).

*O.N. Jonas Co. v. Badische Corp.*, 706 F.2d 1161, 1163 (11th Cir.1983). Tom's argued at trial, and continues to argue on appeal, that Roboserve has not produced any document or group of documents that satisfy the Georgia Statute of Frauds.

The Georgia Statute of Frauds is based upon section 2–201 of the Uniform Commercial Code. The Official Comment to that U.C.C. section has been cited with approval by the Georgia courts as follows:

The required writing need not contain all the material terms of the contract and such material terms as are stated need

not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. *Harris v. Hine*, 232 Ga. 183, 186, 205 S.E.2d 847, 849 (1974). The cases also hold that a writing is "signed" if it bears "any authentication which identifies the party to be charged" on the contract. *Id.* Under these standards, we will review the evidence on the contract claim.

■ Roboserve contends that 12 documents, admitted into evidence at both trials, collectively satisfy the Georgia Statute of Frauds.[3] A series of writings may properly be considered in this context. *See Lipsey Motors v. Karp Motors, Inc.*, 194 Ga.App. 15, 17, 389 S.E.2d 537, 539 (1989); *In re Rolfe*, 710 F.2d 1, 3 (1st Cir.1983). The 12 documents never directly refer to an existing contract obligating Tom's to purchase 15,260 Stax machines, but Roboserve argues that the documents do provide a basis for believing that the parties had agreed to terms on an oral contract. If so, then Roboserve was entitled to offer oral testimony to the jury on the contract issue. *See Jinright v. Russell*, 182 S.E.2d at 330 ("The check does not prove a contract, but it would authorize the introduction of oral evidence toward that end. The party asserting the contract still must bear the burden of proving its existence and the terms.").

■ Three of Roboserve's twelve documents cannot satisfy the Statute of Frauds as a matter of law. Two of the exhibits, PX 92 and PX 94, predate the oral contract which was allegedly finalized in November, 1984, and are therefore insuffi-cient "to indicate that a contract for sale has been made between the parties" as required by O.C.G.A. § 11–2–201(1). *See, e.g., Maderas Tropicales v. Southern Crate & Veneer Co.*, 588 F.2d 971, 974 (5th Cir.1979). The draft agreement prepared by Tom's counsel, PX 115, also lacks one of the essential elements of a writing because it is not "signed" by Tom's within the meaning of the statute.

Each of the nine remaining "writings" offered by Roboserve to prove the existence of a contract was the subject of one or more factual disputes in the district court, which explains in part why the transcript from the second trial contains 13 record volumes. One exhibit, PX 100, provides a particularly instructive example of how conflicting interpretations of evidence were presented to the jury.

The exhibit is a Tom's internal memorandum dated December 4, 1984 from Bill Langley, Tom's Marketing Services Manager, to Mike Dillon, who was then Tom's Executive Vice–President of Sales and Marketing. Langley had primary responsibility for dealing with Roboserve until January, 1986. In general terms, the memorandum first discusses Tom's satisfaction with the initial test order of 25 Stax machines it had placed with three distributors. It also mentions, among other things, a "cup price agreement" whereby Tom's would obtain volume discounts on purchases of filled cups from Roboserve[4], and it includes a chart detailing machine purchases through 1990 and estimated cup usage in connection with the Roboserve program. The machine numbers correspond to Tom's minimum

---

**3.** These documents are identified by exhibit number from the second trial as follows: (1) Plaintiff's Exhibit ("PX") 92, dated September 7, 1984 (Tom's internal memorandum); (2) PX 94, dated October 30, 1984 (Tom's Monthly Operations Report); (3) PX 102–00138, dated December 3, 1984 (Tom's internal correspondence); (4) PX 100, dated December 4, 1984 (Tom's internal memorandum); (5) PX 102, dated December 20, 1984 (Tom's internal memorandum); (6) Defendant's Exhibit ("DX") 258, dated January 3, 1985 (Tom's Purchase Order for 260 machines); (7) PX 115, undated (Tom's Draft Agreement with Roboserve); (8) PX 117, dated September 4, 1985 (Tom's internal correspon-dence); (9) PX 260, undated (Tom's Management Clearance Change Authorization); (10) PX 137, undated (Minutes of Tom's Board of Directors meeting on 1/15/86); (11) PX 135, dated January 9, 1986 (Tom's Purchase Requisition for 1000 machines); and (12) DX 259, dated February 12, 1986 (Tom's Purchase Order for 1000 machines).

**4.** Tom's purchase price was to be 8.25 cents per cup for the first 20 million cups per year, 7.75 cents for each cup over 20 million and up to 50 million per year, and 7.25 cents for each cup over 50 million per year.

purchase requirements under the alleged contract.

Roboserve contends that PX 100 is "perhaps the most persuasive" written evidence that the parties had agreed to an oral contract by December, 1984.[5] The exhibit refers to the "on-going magnitude of the project" and discusses price breaks for volume cup purchases that would require a large number of Stax machines to be placed with Tom's distributors. Roboserve argues that the numbers reflect Tom's recognition of its obligations under the alleged oral contract, and that the memo therefore satisfies the Statute of Frauds by providing "a basis for believing" that the testimony offered at trial rested upon a real transaction. *Lipsey Motors*, 389 S.E.2d at 538–39.

Tom's counters that PX 100 discusses the ongoing test of 25 Stax machines and includes speculative internal projections of machine purchases, cup usage and potential profit under stated assumptions. The cup usage projection explicitly assumes "machine purchases as indicated" through 1990, and further assumes that each machine will vend 120 cups per week. The memorandum does not mention an existing contract, although the parties did agree to reduce cup prices as sales volumes increased. Roboserve emphasized that "cup price agreement" at trial, but did not claim that Tom's was bound to purchase a minimum number of cups at any time. Accordingly, Tom's argues, neither PX 100 nor any other document in evidence provides a basis for believing that the parties agreed to terms on an oral contract.

Similar factual disagreements clouded the presentation of virtually all the evidence at trial. In the context of Roboserve's contract claim, even innocuous documents such as Tom's purchase orders for Stax machines (DX 258 and DX 259) became the subject of dispute. The orders demonstrated Tom's willingness to purchase 260 machines on January 3, 1985, and another 1000 machines on February 12, 1986, but managed to fit neatly into each litigant's theory of the case. Roboserve

argues that the orders validate its contract claim because the numbers match the alleged minimum purchase requirement for machines in the first two years of the contract. Tom's contends that the orders were part of its expansion of an ongoing test of the Stax machines and that they provide no independent evidence of any oral contract.

In this situation, we are constrained by our standards of review. Under the best of circumstances, an exhaustive study of a sterile record can provide only a superficial understanding of the events at trial. We cannot observe the demeanor of witnesses, or recall the inflection in the voice of a witness attempting to answer a difficult question. Testimony that seems evasive or disingenuous on paper may be a tentative response to a misunderstood question. The trial judge and jury are uniquely able to assess the evidence as it is presented; we defer to their judgment unless we are convinced that a mistake has been made. *See, e.g., United States v. Rodriguez*, 765 F.2d 1546, 1557 (11th Cir.1985).

Accordingly, we do not find that Tom's was entitled to JNOV or a new trial on the breach of contract claim (Count VI) based upon the Statute of Frauds. This conclusion is supported by the factual complexity of the case and the inherent plausibility of the arguments on both sides of the contract claim. Although we might not agree that the documentary evidence proves a contract, we do believe that Roboserve presented enough of such evidence to surmount Georgia's minimal Statute of Frauds requirement and, therefore, should have been permitted to offer oral testimony on its contract claim. *See Jinright v. Russell*, 182 S.E.2d at 330.

### b. Proof Of Lost Profits

■ In its motion for JNOV or new trial on Count VI, Tom's also claimed that the jury verdict impermissibly awarded Roboserve lost future profits that were in fact too uncertain and speculative to be capable of reasonable ascertainment. We must look to Georgia law to resolve this chal-

5. Reply and Response of the Plaintiff–Appellee– Cross Appellant Roboserve, Ltd. at 21.

lenge to the jury's verdict. *Novatel Communications, Inc. v. Cellular Telephone Supply, Inc.*, 856 F.2d 151, 156 (11th Cir. 1988).

█ Under Georgia law, future profits are ordinarily too speculative to be recovered, unless "the type of business and history of profits make the calculation of profits reasonably ascertainable...." *Southern Crate & Veneer Co. v. McDowell*, 163 Ga.App. 153, 154, 293 S.E.2d 541, 543 (1982). Tom's argues that Roboserve cannot seek lost profits without first proving a "track record" of profitability. *See Stern's Gallery of Gifts, Inc. v. Corporate Property Investors, Inc.*, 176 Ga.App. 586, 592, 337 S.E.2d 29, 34–35 (1985). Tom's further contends that Roboserve's claim is legally deficient because it has no such track record for the Stax program.

In the *Novatel* case, this court considered a claim for future profits under similar circumstances. The plaintiff sought to recover lost profits resulting from a breach of contract under Georgia law. The defendant argued that such damages were not recoverable because the plaintiff had no track record of profitability. This court rejected that argument, citing *Stern's Gallery* for support, and affirmed the jury's verdict awarding lost profits. *Novatel*, 856 F.2d at 157.

█ Tom's argues that the *Novatel* opinion is based upon an erroneous interpretation of Georgia law, but we are bound by that decision as circuit precedent. *See United States v. Hamblin*, 911 F.2d 551, 554 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2241, 114 L.Ed.2d 482 (1991). If an intervening Georgia case has specifically contradicted *Novatel*, however, we would not be so constrained because we must apply Georgia law, not Eleventh Circuit law, on this issue. *See Novatel*, 856 F.2d at 156.

In October, 1990, the Court of Appeals of Georgia explicitly contradicted *Novatel* when it held that a claimant may recover lost profits only if the business has a history of profits. *Empire Shoe Co. v. NICO Industries, Inc.*, 197 Ga.App. 411, 414, 398 S.E.2d 440, 443 (1990). The court cited

*Stern's Gallery* for that proposition and went on to find that the appellant, Empire Shoe Company, "was not entitled to recover lost profits because it had no track record of profitability." *Id.*

*Stern's Gallery* is not an esoteric opinion, though it has been cited by two courts as precedent for holdings that cannot be reconciled. The case involved a two-year old business with no past profits but a history of diminishing losses ($13,000 in the first year of operation and $3,000 in the second). In *dictum*, the court of appeals observed that "[i]n such circumstances it would perhaps be reasonable to project that, if the business continued to grow at the same rate, the firm would soon show a profit." *Stern's Gallery*, 337 S.E.2d at 35. Nonetheless, the jury had not awarded lost profits at trial, and the verdict was affirmed on appeal.

The *Novatel* court interpreted *Stern's Gallery* as follows:

If, as Novatel contends, a history of profitability is required for entitlement to an award for lost profits, the court's task in *Stern's Gallery* would have been a fairly simply [sic] one given the fact that the appellant had not yet shown a profit at the time the cause of action arose. It is obvious, however, that a history of profits is only *one* factor to be considered in determining whether recovery may be had for lost profits.

*Novatel*, 856 F.2d at 157 (emphasis in original). Significantly, however, the court in *Stern's Gallery* never held that anticipated profits were available absent a track record of profitability; the *Novatel* court apparently inferred the basis for its holding from the Georgia court's musings about whether a history of diminishing losses could substitute for a track record of profitability. *Id.*

█ The *Novatel* decision does not state whether the plaintiff therein proved a history of diminishing losses from which the jury could reasonably extrapolate a calculation of future profits. In any event, the recent *Empire Shoe* decision supports our conclusion that Georgia law *does* require a track record before a business can

recover lost future profits. That track record can be a history of profits, or a pattern of diminishing losses for a new business, so long as the evidence renders anticipated profits reasonably ascertainable. *See Stern's Gallery*, 337 S.E.2d at 34–35; *Southern Crate*, 293 S.E.2d at 543. We must now review Roboserve's damages evidence in relation to the economic history of its Stax program.

■ At trial, Roboserve introduced expert testimony on the issue of damages. The witness, Michael Barford, was an accountant who calculated the lost future profits traceable to Tom's breach of the alleged oral contract. Barford assumed that Tom's would purchase 15,260 Stax machines through 1990, and that it would continue to purchase filled cups for those machines through 1999, averaging 120 cups per week. The cup figures ran through 1999 only because Barford first assumed an eight-year life for the Stax machines. R21–29–30. Accordingly, the machines would gradually drop out of service after eight years until the last 4000 machines sold in 1990 were retired after 1999. For an alternative damage calculation, Barford assumed the machines would be repaired and refurbished to extend their useful life, and cup sales, through the end of the contract in 2004. R21–36–37.

Barford assumed support costs of $300,-000 per year for the first six years of the Stax program, and then progressively smaller support costs after Tom's purchased its last Stax machine in 1990. The figures used were based upon Roboserve's experience with the program in 1986, when support costs were approximately $280,000. R21–25. Costs were deducted from Roboserve's yearly estimated gross profit on sales of machines and cups, and all net profit figures were discounted to present value. R21–19–32, 56–58.

■ Barford's future profit calculations were predicated upon his analysis of Roboserve's earnings and expenses in the Stax program prior to the alleged breach of contract. R21–11–12, 24–25, 43–49; R25–233–

34. While the profitability of Roboserve's Stax Division in 1986 was a point of contention at trial, it is irrelevant to this appeal because Roboserve presented testimony that the Stax Division produced cups for other customers and did not sell machines to Tom's. R15–145–50. In any event, the jury could justifiably conclude that Roboserve made a profit on its sales of Stax machines to Tom's, because Roboserve's sale price per machine exceeded its manufacturing cost per machine in 1986. *See* PX D–79 through PX D–116.[6] The evidence does not require such a conclusion, but it provides a foundation upon which reasonable jurors could disagree. That is enough to prevent an appellate court from invading the province of the jury on a motion for JNOV. *Carter*, 870 F.2d at 581.

Roboserve's evidence of damages was disputed vigorously. Barford was cross-examined by Tom's trial counsel, and Tom's offered its own expert witness, Dr. Victor Andrews, who presented an extensive critique of Barford's analysis. Andrews attacked the bases for Barford's assumptions and his method for calculating Roboserve's lost future profits. Like Barford, Andrews was cross-examined at length by opposing counsel. Ultimately, the trial judge and jury heard almost two full days of complicated testimony about Roboserve's damages for breach of contract. The jury was instructed to assess the credibility of the witnesses and the foundation for Roboserve's claimed damages before reaching its verdict. R26–103–06, 129–34.

■ Under these circumstances, we find that Roboserve's evidence enabled the jury to calculate lost future profits from the sale of Stax machines to Tom's with reasonable certainty. Georgia law requires "definite, certain and reasonable data" for the computation of future profits, but it does not require "exact mathematical certainty." *Grossberg v. Judson Gilmore Assoc.*, 196 Ga.App. 107, 108, 395 S.E.2d 592, 594 (1990). The alleged contract contemplated the sale of a specific number of

---

**6.** Roboserve's damage exhibits were admitted into evidence as D–1 through D–116, so we will identify those exhibits as PX D–1 through PX D–116.

machines over six years, and the jury could reasonably estimate Roboserve's production costs and sales price per machine from 1986 figures. The district court also instructed the jury to discount any award of future profits to present value. R26–132–34. Accordingly, Roboserve established an adequate foundation for recovery of future profits from lost machine sales attributable to Tom's breach of the oral contract.

Roboserve also sought future profits from prospective sales of filled cups to Tom's. The jury verdict apparently included damages for breach of an alleged requirements contract for cups between these parties.[7] Roboserve claims that Tom's agreed to purchase filled cups for its Stax machines exclusively from Roboserve for 20 years.

Georgia law permits contracts for the sale of goods to measure quantity by the good faith output of the seller or the good faith requirements of the buyer. O.C.G.A. § 11–2–306(1). Such contracts do not automatically fail for their lack of a definite quantity term, but "no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded." *Id.* If we assume the jury found that Tom's was bound to purchase its cup requirements for the Stax machines exclusively from Roboserve, then a quantity term must be defined in order to calculate future profits from lost cup sales.

Roboserve's chairman and co-founder, William Fattal, testified that the company made a profit on its sales of filled cups to Tom's in 1986. R16–62–70; *see also* PX D–1 through PX D–75. Roboserve's expert witness then assumed that Roboserve's cup sales would average 120 cups per machine, per week for the purpose of calculating anticipated profits. R21–23–24. That figure was taken from PX 100, a Tom's inter-

nal memorandum that was discussed in part II(B)(1)(a) of this opinion. PX 100 estimated Tom's return on sales for the Stax program after assuming, among other things, that its distributors would sell an average of 120 cups per machine, per week.

By December, 1984, when PX 100 was written, Tom's had purchased 25 Stax machines from Roboserve and those machines had been on location with Tom's distributors for three to six months. However, Roboserve presented evidence from which a jury could conclude that Tom's distributors continued to sell at least 120 cups per machine, per week through the middle of 1986. In PX 150, dated August 29, 1986, Jim Davis of Tom's stated that Tom's distributors averaged $30/$35 per week in retail sales of cups through Stax machines. At 25 cents per cup, that represents 120 to 140 cups per week.

The sales figures discussed in PX 150 arguably provide empirical support for the proposition that Tom's experience with the Stax program validated the original estimate of 120 cups per machine, per week. Roboserve therefore established an adequate foundation for the jury's award of lost future profits resulting from Tom's breach of the alleged requirements contract for filled cups. Accordingly, we affirm the district court's denial of Tom's motion for JNOV or new trial on Count VI, the breach of contract claim. Roboserve is entitled to recover $3,645,500 from Tom's for Count VI.

### 2. Tom's Motion For JNOV Or New Trial On Counts II And IV

In addition to the contract claim, Roboserve's complaint included another three counts that were decided by the jury after the second trial. Count III alleged that Tom's violated a Roboserve confidentiality agreement dated May 16, 1984; the jury disagreed and returned a verdict for Tom's.

---

**7.** The jury awarded Roboserve $3,645,500 in compensatory damages for Count VI. If the entire award was attributable to lost sales of machines, and Tom's purchased the minimum number of machines required by the contract, then the present value of the average profit per machine sold would be approximately $260.

Roboserve's average profit per machine sold in 1986 was substantially less than $260. *See* PX D–79 through PX D–82, PX D–93 through PX D–109. Therefore, we must assume that lost cup sales accounted for part of the jury's award of future profits.

Count II complained that Tom's breached a confidential relationship with Roboserve, and Count IV sought damages for Tom's alleged misappropriation of Roboserve's trade secrets. The jury awarded Roboserve $1,100,000 for Counts II and IV; the verdict was not apportioned between the two counts. Tom's moved for JNOV or new trial on Counts II and IV and now appeals the district court's denial of that motion.

Roboserve's claims in Counts II and IV are predicated upon Tom's shipment of a Stax machine to another manufacturer, Polyvend, on two occasions. Polyvend is based in Conway, Arkansas and is Tom's primary domestic supplier of snack machines. On November 3, 1986, Tom's shipped the first machine to Polyvend, ostensibly so that Polyvend could estimate the cost of manufacturing such a machine in the United States. Tom's alleges that Roboserve was aware of Tom's desire to establish Stax production facilities in the United States, and that Roboserve had been receptive to the idea of a possible licensing arrangement with Polyvend to facilitate domestic manufacture of Stax machines. Three days after Roboserve was notified of the shipment on November 7, however, the company angrily demanded that Tom's retrieve the Stax machine from Polyvend. Tom's complied with that request.

The Polyvend incident apparently incited a rapid deterioration in the relationship between these parties, who met for the last time in January, 1987. A few weeks later, Tom's sent another Stax machine to Polyvend, this time so that Polyvend could design a "retrofit" mechanism to enable Tom's existing inventory of Stax machines to vend non-Roboserve cups. Polyvend designed and produced a retrofit kit for the Stax machines, and Tom's purchased the kits but ultimately decided not to install them.

Roboserve contends that Tom's misappropriated trade secrets and confidential information embodied in the Stax machines when Tom's shipped those machines to Polyvend. It is undisputed that Tom's had paid Roboserve in full for the Stax machines prior to shipment. At trial, Roboserve emphasized that Polyvend was unable to develop a satisfactory in-cup hot beverage machine for Tom's in the early 1980's, and implied that Tom's actions were egregious because the recipient and intended beneficiary was a direct competitor of Roboserve. However, at the time of trial Polyvend was not attempting to market or produce an in-cup hot beverage machine, nor had it evinced any intention to enter into direct competition with Roboserve as an in-cup manufacturer.

#### a. Misappropriation Of Trade Secrets

■ The district court erred in denying Tom's motion for JNOV on Count IV, because the Georgia law of trade secrets cannot protect any unpatented part or combination of parts in the Stax machine after the machine was sold to Tom's.[8] The sale destroyed any reasonable expectation of secrecy by placing the machines in the public domain. *See Monumental Properties of Georgia, Inc. v. Frontier Disposal, Inc.*, 159 Ga.App. 35, 37–38, 282 S.E.2d 660, 663 (1981) ("A property right in the unpatented product is only exclusive until it becomes the property of the public by being placed on the market.").

■ When Tom's shipped the second machine to Polyvend in 1987, Georgia law defined a trade secret as follows:

A trade secret, within the rules pertaining to the rights which can be protected by injunction, is a plan, process, tool, mechanism, or compound, known only to its owner and those of his employees to whom it must be confided in order to apply it to the uses intended.

*Thomas v. Best Mfg. Corp.*, 234 Ga. 787, 789, 218 S.E.2d 68, 71 (1975). If Roboserve seeks trade secret protection for a mechanism within the Stax machine, it must demonstrate that access to the alleged trade

---

**8.** Roboserve holds patents on discrete parts of the Stax machine, but raises no claim of patent infringement in this case. The Stax machine contains a combination of patented and unpatented parts; however, the machine itself is not protected by federal patent law.

secret has been strictly limited. *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, 908 F.2d 706, 710–11 (11th Cir. 1990). *See also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 484, 94 S.Ct. 1879, 1887, 40 L.Ed.2d 315 (1974) ("By definition a trade secret has not been placed in the public domain.").

■ Roboserve claims that the Stax machines did not enter the public domain when Tom's purchased them, but Tom's immediately resold those machines to distributors who have no direct connection to Roboserve. By November, 1986, Tom's had purchased 1,285 Stax machines from Roboserve, and most were owned and operated by Tom's distributors. Moreover, the federal patent laws preemptively prohibit a trade secret claim under these facts. *See Acuson Corp. v. Aloka Co., Ltd.*, 209 Cal. App.3d 425, 257 Cal.Rptr. 368, 374 (1989).

In the *Acuson* case, both parties manufactured ultrasonic imaging equipment for sale to hospitals and medical professionals. Acuson alleged that Aloka misappropriated trade secrets by surreptitiously purchasing an Acuson machine to copy parts of that machine for incorporation into its own product. Acuson sought relief under the California law of trade secrets, but the court found that Acuson's claim was preempted by federal law:

> Patent and copyright law provide the exclusive means of obtaining a monopoly on a product that has been disclosed to the public. In contrast, "ownership of a trade secret does not give the owner a monopoly in its use, but merely a proprietary right which equity protects against usurpation by unfair means." ... If federal law leaves an object in the public domain, state law may not prohibit its copying.

*Id.*, 257 Cal.Rptr. at 374 (citations omitted). The court concluded that Acuson was not entitled to trade secret protection because "[a]t least hundreds of the product have been sold since it was introduced in 1983." *Id.* The court also rejected Acuson's argument that the machine was not in the public domain because it was sold only to the medical community, not the general public. *Id.* at 374–75.

■ As recently as 1989, the Supreme Court has noted that state trade secret laws cannot be used to prohibit reverse engineering, whereby a party starts with a known product and works backward to discern the process by which it was manufactured. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160, 109 S.Ct. 971, 982, 103 L.Ed.2d 118 (1989) ("This is clearly one of the rights vested in the federal patent holder, but has never been a part of state protection under the law of unfair competition or trade secrets."). Accordingly, once Tom's purchased a Stax machine from Roboserve, trade secret law could not prevent Tom's from dissecting that machine for any reason, or from shipping it to Polyvend for dissection. *See Monumental Properties*, 282 S.E.2d at 663. We therefore reverse the district court's decision to deny Tom's motion for JNOV on Count IV.

### b. Breach Of Confidential Relationship

The second jury found that Roboserve and Tom's had a confidential relationship, and that Tom's breached that relationship by providing Roboserve's confidential information to Polyvend. Georgia law defines confidential relations as follows:

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith....

O.C.G.A. § 23–2–58. It is important to note that "confidential information" as it pertains to Count II may be defined more broadly than the "confidential information" explicitly protected by PX 82, the Roboserve confidentiality agreement. The jury found that Tom's did not violate the written agreement, but that verdict on Count III is not inherently inconsistent with the decision to award damages on Count II.

Similarly, our decision that Tom's did not misappropriate Roboserve's trade secrets does not preclude a finding of liability on Count II, because an item may be considered confidential in the context of a business relationship without rising to the level of a trade secret. A confidential relationship is distinguished by the expectations of the parties involved, *Capriulo v. Bankers Life Co.*, 178 Ga.App. 635, 638–40, 344 S.E.2d 430, 432–33 (1986), while a trade secret is identified through rigorous examination of the information sought to be protected. The jury is empowered to decide whether a confidential relationship exists under the facts of a particular case. *Id.*, 344 S.E.2d at 434.

At trial, Roboserve presented evidence that Tom's provided the Stax machines and accompanying manuals, as well as certain correspondence between Tom's and Roboserve that included commercially sensitive information about the Stax program, to Polyvend. Roboserve claimed that Tom's acted without permission from Roboserve and without regard to Roboserve's stated expectation that the machines and other materials would be kept confidential. Roboserve attempted to prove that its expectation was reasonable through two exhibits, PX 73 and PX 76, which specifically mention confidentiality. Both exhibits predate the written confidentiality agreement signed by Mike Dillon of Tom's on May 16, 1984. Roboserve argued that the exhibits and the testimony of Elias and William Fattal establish that Tom's knew of, and agreed to, Roboserve's demands for secrecy. R15–201–04; R19–34–35, 37–38, 52, 59–63.

Roboserve offered sufficient evidence to create a jury issue on Count II, the confidential relationship claim. Our review of the record reveals some confusion and overlap of claims and evidence on Counts II, III and IV, which raises a concern that the jury might not have considered Roboserve's confidential relationship claim independently from the trade secret count. The jury instructions on Count II, however, explicitly delineated the elements of that claim without reference to trade secrets.

R26–115–19. We therefore affirm the district court's denial of Tom's motion for JNOV or new trial on Count II because the verdict is supported by the evidence, but we must remand on the issue of damages because the jury awarded a lump sum of $1,100,000 for Counts II and IV. On remand the jury must separate Roboserve's damages for breach of confidential relationship, which are recoverable, from those for misappropriation of trade secrets, which are not recoverable under the facts of this case.

3. Tom's Motion For Directed Verdict On Roboserve's Claim For Punitive Damages

In addition to compensatory damages, Roboserve sought punitive damages in Counts II and IV. At the end of the second trial, however, Tom's moved for directed verdict on the punitive damage claims and the district court granted the motion. Roboserve appeals that ruling as to both counts, but the appeal on Count IV is mooted by our decision that Tom's was entitled to JNOV on the trade secrets issue. We now consider Roboserve's claim for punitive damages in Count II.

A directed verdict presents a question of law. We review the district court's ruling to decide whether a reasonable jury could conclude that Tom's conduct "reached the level of indifference or willfulness at which punitive damages are appropriate." *Benford v. Richards Medical Co.*, 792 F.2d 1537, 1539 (11th Cir.1986). Georgia law requires a finding of "wilful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences" before punitive damages may be awarded. *Associated Health Systems, Inc. v. Jones*, 185 Ga.App. 798, 802, 366 S.E.2d 147, 152 (1988).

The district court rejected Roboserve's claim for punitive damages on the basis of DX 85, a letter dated November 25, 1986, from Elias Fattal to Richard Olson at Tom's. On November 4, 1986, Tom's had shipped a Stax machine to Polyvend, and that action provoked an angry

telex from Roboserve demanding immediate retrieval of the machine. In DX 85, Fattal reiterated Roboserve's position that the shipment violated the confidentiality agreement between the parties, but also explained that "there is nothing in my telex of 10th November that either implies or was intended to imply that Tom's intended to act to our detriment in a deliberate way." The district court ruled that such an admission precluded Roboserve from seeking punitive damages. R25–276–77.

Roboserve countered that DX 85 was a diplomatic attempt to salvage a damaged relationship, and offered several incidents that occurred after the letter was written as additional evidence of Tom's willful misconduct. However, we have thoroughly reviewed the record in this case, and we do not find that Roboserve presented sufficient evidence to create a jury issue on its claim for punitive damages. We affirm the directed verdict in favor of Tom's on the punitive damage claim in Count II.

## III. CONCLUSION

We AFFIRM the district court's decision to order a new trial on each count of Roboserve's complaint after the first trial. We REVERSE the decision to order a new trial on Tom's counterclaim, and reinstate the first jury's verdict on the counterclaim in favor of Roboserve.

The remainder of this decision pertains to the second trial. On Roboserve's breach of contract claim (Count VI), we AFFIRM the denial of Tom's motion for JNOV or new trial. We REVERSE the district court's denial of Tom's motion for JNOV on Count IV, the misappropriation of trade secrets claim. Judgment should be entered in favor of Tom's on Count IV. We AFFIRM the denial of Tom's motion for JNOV or new trial on Count II, for breach of confidential relationship. We REMAND for the limited purpose of separating Roboserve's damages on Count II from those improperly awarded by the jury for Count IV.

Finally, we AFFIRM the directed verdict in favor of Tom's on Roboserve's request for punitive damages in Counts II and IV. On remand, the district court should also consider Count VII, the promissory estoppel claim, unless that count has been otherwise resolved or dismissed.

AFFIRMED in part, REVERSED in part, and REMANDED in part.