In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 07-3520 and 08-2851

U.S. NEUROSURGICAL, INCORPORATED,
a Delaware Corporation, as successor
in interest to GLOBAL HEALTH SYSTEMS,
INCORPORATED, a Delaware Corporation,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, an Illinois municipal corporation,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 4894—**Joan Humphrey Lefkow**, *Judge.*

ARGUED JANUARY 23, 2009—DECIDED JULY 9, 2009

Before BAUER, EVANS, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* The City of Chicago (the "City")
hired Global Health Systems, Inc. ("Global") to install a
computer information system for the Chicago Depart-
ment of Health. Although the installation of the system

ultimately was successful, the parties argued over whether some of the work Global performed was covered by the contract price or constituted extra work for which the City owed additional money.

U.S. NeuroSurgical, Inc., as successor in interest to Global, sued the City, alleging a breach of contract and seeking recovery for unpaid invoices. Following a bench trial, the district court entered judgment for the City, which U.S. NeuroSurgical, Inc. appeals and we affirm.

## I. BACKGROUND

On June 30, 1995, Global signed a contract with the City in which Global agreed to design, install, implement, and manage a computer information system for the Chicago Department of Health (CDOH). Recognizing that CDOH needed a computerized system which integrated information amassed at a number of separate health care clinics, the City purchased the Global Health Information System (Global System) to function as the means of collecting, automating, manipulating, analyzing, and displaying volumes of data.

The Global System was not built from scratch for the City; rather, the system used existing software that Global expected to modify to meet the particular specifications of its clients. For the City's purposes, the Global System would be used to implement clinical case management and billing functions for CDOH; the contract described many modifications that Global would make to the Global System to render it capable of performing those desired functions.

There were a number of ways in which a client such as the City could get data into the Global System. Generally, Global's service was to build an interface that would make the Global System capable of receiving data exported from a client's existing computer system. However, the Global System could also receive data through conventional key entry, and purportedly, through an alternative method such as scanning. We use the word purportedly only because at the time Global and the City entered into the contract, the Global System did not include a scanning function; it processed only data that was "keyed in" at terminals. However, Global had represented to Jack Lenihan, the City's project manager, that the Global System had the capability of receiving scanned data.

The contract between the parties provided that data entry would be the City's task, but it left open the mechanism by which the data would make its way into the Global System.

The contract provision addressing data entry modes read as follows:

> Current configuration calls for data keyed entry. . . . [Global] will assist CDOH in assessing the feasibility of alternative data entry modes, such as scannable forms and bar coding, and will incorporate changes in hardware and [Global System] where alternative data entry is found to be more appropriate by CDOH.

An additional provision stated, "[u]nless specifically noted to the contrary, all provisions called for in this project plan are included in the contracted price."

Had the City decided that key entry would suffice as the method of inputting new data into the Global System, this lawsuit may not have been brought. But the City decided that it wanted the Global System at CDOH's sexually transmitted disease (STD) clinics to include a scanning function. Global dispatched its software developer, Bill Hartmann, to visit the STD clinics and perform an assessment of the clinics' existing computerized system. At that time, the STD clinics had scanning capacity that allowed employees to take a completed form, such as that filled out by a patient following his visit, and import the form into a computer so that the information on the form would become data stored in the computer's database. Hartmann understood that the City wanted its new system to have similar capacity, and noted that it would be unacceptable for the clinics to be deficient in this area. The implementation of the feature, however, would prove quite difficult and give rise to the present dispute.

Because scanning alone yields only a visual image of a document, software was needed to help transform the visual information into usable data. On Global's recommendation, CDOH selected Teleform, a scanning software that could be used to accomplish this objective through a three-step process: first, the data was validated, or edited to correct inconsistencies; second, the validated data was formatted into an output, or export file that met the system's specifications; finally, the data could be "pushed," or transferred, into the Global System. A computer programmer was needed to perform each category of change.

At the recommendation of Global's Vice-President, a subcontractor named Burt Quint was hired to perform the first two categories of programming. When Quint failed to produce an export file that met Global's specifications for the Global System, he was fired. Global took over some of Quint's tasks, while the City performed other aspects of the work.

At trial, Alan Gold, Global's President and Chief Executive Officer, testified that he told Lenihan that if Global performed any of the work Quint had not completed, it "could be extra work." According to Gold, Lenihan responded that Global should do "whatever [it] had to" to implement the scanning function and that Lenihan could get the money to pay for the work. According to Lenihan, however, no such conversation ever occurred.[1]

In any event, the project went forward. After Global and the City completed Quint's tasks, Global made the final programming adjustments necessary for the Global System to process data, and the scanning function ultimately worked. However, Global classified the programming as an "additional service" that was not covered by the underlying contract.

The contract contemplated a scenario in which additional services could be rendered. Section 4.6 of the contract stated that, "[f]rom time to time the City may request [Global] to perform such additional services such [sic] as data entry or other consulting, which are not set

[1] The district court found there was insufficient proof of the alleged conversation to warrant inclusion in its factual findings.

forth in the Project Plan." In that event, Global would charge the City its current rates, "to be quoted at the start of any work agreed to by the parties, in accordance with the provisions of Section 4.7." Section 4.7 established those procedures. It required Global to submit a written work plan and cost estimate to the City; if agreement was reached, Global was then required to submit a detailed work order, which, after several layers of internal bureaucratic approval, would result in the issuance of an amendment to the contract corresponding to the work order.

Although the above procedures were not followed, Global nonetheless reasoned that the parties had orally agreed to modify the original contract; it billed the City for the "extra" work it had performed. The City did not pay Global for that work.

On July 11, 2002, USN, Global's successor in interest, sued the City in federal court. It alleged that the City breached its contract with Global and sought compensation in the amount of $532,033.35 for programming work done by Global in connection with the implementation of the scanning operation at CDOH's STD clinics.

Following a bench trial, the district court denied any relief to USN, finding that the work Global performed did not amount to more than that which was contemplated in the original contract and thus, USN was not entitled to additional compensation. The judge reasoned that Global was contractually obligated to complete the work because two preconditions had been met: the scanning method of data entry had been determined to be

feasible, and, by the City's judgment, more appropriate. Although the work came at greater expense than Global had originally anticipated, it was necessary to render the Global System capable of receiving the CDOH data and thus fell within the broad "will incorporate changes" language of the contract.

The district court further found that, even if the work performed by Global were outside the scope of the contract, the new agreement was without effect because: (1) it was not executed by the City's chief procurement officer, the sole authority under statute that was vested with the power to bind the City contractually; (2) it was not in writing, as required by the City's Municipal Code; and (3) it did not comply with the Additional Services procedure governing modifications set forth in the contract. The district court also ruled that USN was not entitled to recover approximately $32,000.00 from the City for billed receivables under an account stated theory. The court denied USN's claim for payment of twelve invoices totaling that amount because USN had not offered the invoices into evidence and, moreover, Lenihan testified that he had rejected each of those invoices. It declined to address USN's account stated theory with respect to a final invoice in the amount of $250,000.00.

## II.  DISCUSSION

On appeal, USN contends that the district court erred by ruling in favor of the City. According to USN, the scanning implementation services it performed for the City constituted extra work that required additional compensation. It claims that the parties reached a mutual agreement to carry forward with this work under a modified version of the original contract. Although the changes were not made using the procedures that were detailed in the contract, USN reasons that they are binding nonetheless because Lenihan had been expressly delegated the authority to contract. As an alternate theory of recovery, USN argues that the City's failure to contest the correctness of Global's invoices established an account stated. Finally, USN contends that the district court abused its discretion in awarding the City costs associated with the litigation of USN's claims. Because a modified contract could only be valid if it was entered into with proper authority, we begin our analysis by considering this question.

### A.  Authority to Contract

The district court determined that any purported oral modification to the contract was without legal effect. We review the district court's legal conclusions de novo. *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002).

The contract between Global and the City included a choice-of-law provision, which specified that the agree-

ment was governed by Illinois law. The City of Chicago's power to contract is limited by Illinois law. *CFM v. City of Chicago*, 516 N.E.2d 880, 884 (Ill. App. Ct. 1987). Unless the power to bind the City in a contract is expressly delegated to someone other than the statutory authority, only corporate authorities may execute contracts. *McMahon v. City of Chicago*, 789 N.E.2d 347, 352 (Ill. App. Ct. 2003). Pursuant to Illinois' Municipal Purchasing Act (65 ILCS 5/8-10-16), the City created a department of purchases, contracts and supplies headed by a procurement officer, who acts as the sole agent of the municipality in contracting. *CFM*, 516 N.E.2d at 884.

Here, the purported agreement that Lenihan entered into with Global on the City's behalf exceeds the limits of the City's power to contract. That is to say, even if Lenihan reached agreement with Global that the scanning implementation was additional work requiring additional compensation, the agreement did not comply with the provisions of the Municipal Purchasing Act or the Municipal Code of Chicago. Lenihan was not the City's procurement officer and had no statutory authority to bind the City in contract.

Global is charged with knowing the level of authority Lenihan actually possessed. *D.S.A. Finance Corp. v. County of Cook*, 801 N.E.2d 1075, 1081-82. (Ill. App. Ct. 2003). Business transactions involving municipal corporations are not governed by the same rules that govern non-governmental entities. *Id.* at 1081. Illinois courts presume a party doing business with a government entity knows two things: (1) he cannot enforce a contract unless the

applicable statutory method of executing the contract has been followed; and (2) statutes and ordinances limit an official's authority to bind a government entity to a contract. *Id*. While the original contract between Global and the City followed the requirements of State and City statute, the purported modified agreement did not. It is therefore unenforceable.

Nevertheless, USN contends that the City expressly delegated contracting authority to Lenihan. As noted above, a caveat to the principle that the authority to bind an Illinois municipality in contract rests solely with those who have been designated by statute to do so is when there has been an express delegation of that authority to another. *McMahon*, 789 N.E. 2d at 352. According to USN, such delegation to Lenihan is evident from the language of the contract as well as the conduct of Lenihan and his superiors.

As USN notes, the contract stated that Lenihan's duties included the "approval of all changes to project plans." USN reasons that this provision can be read as a delegation of authority to Lenihan to modify the existing contract. We disagree.

In our view, authority vested in Lenihan to oversee changes to a project plan does not equate to a delegation of authority to bind the City contractually. A satisfactory project plan was but one of a number of procedures required before a new contract could be established. The contract called for many layers of approval: Global had to submit a written work plan and cost estimate to the City; after review was completed and an agreement

with Global was reached, Global would submit a final detailed quotation known as a "Work Order" that needed to be signed by CDOH, and approved by the I.T. department. Finally, CDOH would request that the purchasing department process a contractual amendment corresponding to the Work Order.

Although Lenihan's approval of changes was necessary to create a modified contract, it alone was not sufficient. The language highlighted by USN simply falls short of an express delegation of authority to Lenihan to bind the City in contract.

Next, USN notes several distinct change provisions in the contract which, it argues, contemplate the delegation of authority to the project manager, Lenihan. USN cites provision 5.6 of the contract, which specifies that no changes to the contract are valid unless in writing and signed by the parties. It argues that this provision gives the parties the flexibility to make changes without following more rigid requirements set forth in other provisions and detailed above.

We read this provision as did the district court, by its plain meaning. That is, it is merely an express requirement that the modifications to the contract be *in writing*. The provision neither usurps nor supplants the additional layers of approval required.

The remaining examples USN provides in support of its contention that Lenihan was expressly delegated the authority to contract fail to illuminate the proposition for which they purport to stand. For instance, USN cites a number of discussions that it maintains took place

among City employees concerning strategies to procure additional services from Global and secure funds for those services without going through the formal amendment process detailed in the contract. Some of these internal conversations involved Lenihan, others did not.

Apart from the fact that the reliability of these statements is dubious at best and the district court omitted them from its factual findings, none of the alleged conversations involved the City's procurement officer, the sole official vested with authority by statute to bind the city in contract.

We fail to see how discussions amongst mid-level city managers concerning ways to circumnavigate the formal process by which additional services were to be procured from Global is probative of any *express delegation* of contractual authority that was made *to* Lenihan and more importantly, *by* one with the statutory authority to do so.

## B.  Oral Modifications

Furthermore, even if we were to accept USN's position that the City had expressly delegated to Lenihan the authority to contract, any modifications were required to be in writing. Section 5.6 of the contract states that no changes to the contract are valid unless in writing and signed by the parties, or their respective successor and assigns.

USN correctly notes that under Illinois law, the terms of a written contract can be modified by a subsequent oral

agreement notwithstanding contractual language to the contrary. *Tadros v. Kuzmak*, 660 N.E.2d 162, 170 (Ill. App. Ct. 1995). However, in this instance, oral modifications were not only prohibited by the contract, but by statute. The City's Municipal Code requires that all agreements with the City be in writing. *See* Municipal Code of Chicago, Ill. 2-92-050. The statutory language plainly states, "[n]o contract shall be binding . . . until [it] has been duly executed." Thus, whatever the ability of the parties to abrogate the contractual requirement that all changes be in writing, they could not agree to a modification that is prohibited by governing law.

## C. Equitable Estoppel

USN also argues that it is owed compensation under principles of equitable estoppel. It contends that the City's affirmative act of paying for some of the "extra work" induced Global's reliance that the parties had in fact formed a modified contract. We find no merit to this reasoning. As we have already established, Lenihan had no statutory authority to bind the City in contract. A contract that is entered into by a municipality which is expressly prohibited by law is void and cannot there-after be rendered valid by estoppel or ratification on the part of the municipality. *Ad-Ex, Inc. v. City of Chicago*, 565 N.E.2d 669, 675 (Ill. App. Ct. 1990). Therefore, even if Gold and Lenihan had a meeting of the minds which they believed yielded a modified contract calling for Global to receive additional compensation, that purported contract was immediately and permanently void.

### D. Account Stated

USN makes a last attempt at recovery under an account stated theory. It claims that it is owed $282,033.35 based on thirteen invoices it sent the City: twelve invoices for accounts receivable totaling $32,033.35, and one discounted invoice for "special programming," in the amount of $250,000, a total representing only half the number of man hours Global actually worked.

USN failed to raise these contentions in the closing memorandum it filed in the district court. After noting that the claims could be deemed waived based on USN's omission, the district court went on to consider the first account stated claim based on the twelve invoices for accounts receivable but not the second claim based on the single invoice for "special programming." It concluded that USN was not entitled to receive any portion of the $32,033.35 because it had not established an account stated.

Whether an account stated exists is a question of fact. *Dreyer Medical Clinic, S.C. v. Corral*, 591 N.E.2d 111, 114 (Ill. App. Ct. 1992). This court will not set aside a district court's findings of fact unless they are clearly erroneous. *United States v. Hickok*, 77 F.3d 992, 1006 (7th Cir. 1996).

"An account stated is an agreement between the parties who previously engaged in transactions that the account representing those transactions is true and the balance stated is correct, together with a promise for payment of the balance." *Dreyer*, 591 N.E.2d at 114. Where a party acquiesces in the correctness of statements by failing to object to them within a reasonable time, an

account stated is established. *W.E. Erickson, Construction, Inc. v. Congress-Kenilworth Corp.*, 477 N.E.2d 513, 520 (Ill. App. Ct. 1985). However, an account stated is merely a method of proving damages for the breach of a promise to pay a contract and cannot be made the instrument to create an original liability. *Dreyer,* 591 N.E.2d at 114.

The district court found that USN failed to establish an account stated for two reasons: USN did not offer the contested invoices into evidence and Lenihan provided uncontroverted testimony that he rejected the invoices. As Lenihan's testimony was uncontradicted, we are hard-pressed to find any error, much less clear error, that the district court made in finding that an account stated had not been established.

Though the district court did not address USN's account stated claim for the scanning implementation work, we can dispose of it in brief here. As we have already concluded, the purported modified contract was void for lack of authority and thus, the City was not liable to USN for additional payment. Consequently, USN cannot now create an original liability on an account stated theory.

### E.   Recovery of Costs

Finally, USN appeals the district court's judgment awarding damages to the City for various court costs and fees it incurred in the course of preparing to defend the suit on which it ultimately prevailed. The district

court awarded the City $13,659.41, a sum which USN claims was in error because it included costs that are either not recoverable, excessive, or unsupported by proper documentation.

Federal Rule of Civil Procedure 54(d) provides that "costs other than attorney's fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d). Section 1920 of the Judiciary Act plainly states those costs which are recoverable; it includes court reporter fees associated with obtaining transcripts, printing and photocopying fees, clerk fees, and fees associated with obtaining witnesses. 28 U.S.C. § 1920. A district court's determination that a particular cost is reasonable and necessary will not be overturned absent an abuse of discretion. *Manley v. City of Chicago*, 236 F.3d 392, 398 (7th Cir. 2001). Moreover, there is a strong presumption that costs will be awarded to the prevailing party. *Weeks v. Samsung Heavy Industries Co., Ltd.*, 126 F.3d 926, 945 (7th Cir. 1997).

Following the district court's entry of judgment in favor of the City, the City filed a bill of costs that listed four categories of expenses for which the City sought reimbursement: fees paid to the clerk of the court, fees paid to the court reporter for transcripts, fees for witnesses, and fees for copying. The bill of costs specified the amount of costs falling within each of those categories as well as the grand total. The City also attached a fifteen-page itemization of the costs falling within each of the four listed categories as well as various invoices from vendors.

USN filed objections to the bill of costs; the district court entered an order addressing USN's objections and sustaining several of them. At the district court's direction, the City filed a revised bill of costs consistent with the ruling in which the total amount requested was reduced by approximately $1,200.00. The district court then entered judgment awarding the City $13,659.41 in costs.

We find no merit in USN's challenges to the costs awarded by the district court. As the prevailing party, the City was presumptively allowed costs. The City's requests were supported with detailed documentation. The district court thoroughly reviewed the itemized expenses and, after considering USN's objections, awarded the City less than it had sought. The expenses that the City recuperated fell squarely within categories of costs deemed recoverable by 28 U.S.C. § 1920. We find no abuse of discretion.

## III. CONCLUSION

For the reasons discussed above, we AFFIRM the district court's judgment.